IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ARMINIUS SCHLEIFMITTEL GmbH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:06CV00644 |
| | ) | |
| DESIGN INDUSTRIAL, INC. D/B/A/ | ) | |
| DII INTERNATIONAL, APEX PROFILE | ) | |
| SANDING TOOLS, INC., PHILIP RICHUK, | ) | |
| and FRANK LEODOLTER, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

BEATY, Chief Judge.

I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for issuance of a Preliminary Injunction [Document #9] during the pendency of Plaintiff's lawsuit against Defendants for misappropriation of trade secrets pursuant to the North Carolina Trade Secrets Protection Act. N.C. Gen. Stat. § 66-152 *et seq* (2007).[1] Plaintiff in this case is a German company that manufactures customized profile sanding tools which smooth out decorative furniture edges in designs that vary based upon each individual customer's specifications. Plaintiff's tools are made

---

[1] Plaintiff also brings related claims for civil conspiracy by Defendants Richuk and Leodolter to violate the North Carolina Trade Secrets Protection Act, common law conversion, and violations of the North Carolina Unfair and Deceptive Trade Practices Act. To the extent that Plaintiff's conversion and Unfair and Deceptive Trade Practices claims are not the basis for Plaintiff's request for a preliminary injunction, the Court will not consider those claims in this Memorandum Opinion and Order.

up of a sanding tool body, to which rubber base elements and sanding caps are attached. These base elements and sanding caps wear down with repeated use, and Plaintiff has developed a competitive advantage in its industry because its unique tool design allows the base elements and sanding caps to be replaced more easily than can be achieved on the tools of Plaintiff's competitors. Over time, Plaintiff has compiled an electronic library containing precise specifications for how to manufacture these sanding tools for each of their individual customers' designs ("Library").

Defendants in this case acted as Plaintiff's marketing, sales, and distribution agents in the United States from 1993 until late 2004. Although Defendants had no access to Plaintiff's Library during this time, they would receive from Plaintiff raw sketches of customers' specialized profiles in order to assist in their sales efforts. On or about November 26, 2006, Plaintiff terminated its relationship with Defendants, and thereafter, Defendants began competing with Plaintiff by producing duplicates of Plaintiff's rubber base elements and sanding caps as replacements for Plaintiff's tool bodies. In the case presently before the Court, Plaintiff alleges that Defendants have illegitimately succeeded in this endeavor by misappropriating Plaintiff's Library of individualized customer specifications.

On August 22, 2006, the Court granted Plaintiff's Motion for a Temporary Restraining Order [Document #6] and thus issued a Temporary Restraining Order [Document #19] ("TRO") restricting Defendants from using any information misappropriated from Plaintiff. On August 28, 2006, the Court was scheduled to consider Plaintiff's Motion for Preliminary Injunction.

2

However, at that hearing, the attorneys for Defendants asked for leave to end their representation of these Defendants based upon Rule 1.16(a)(1) and 1.16(a)(3) of the North Carolina Rules of Professional Conduct and Local Rule 83.1(e), while Plaintiff informed the Court that Defendant Richuk had violated the Court's TRO by barring Plaintiff from entering Defendants' facilities and copying their computer files. As explained in its second Temporary Restraining Order [Document #42] ("Modified TRO"), the Court resolved these issues at the hearing on August 28, 2006 by extending the previously issued TRO pending the Court's determination with respect to the issuance of a preliminary injunction and also modifying that TRO to include an additional order that Defendants were to be officially closed until the preliminary injunction hearing. The Modified TRO also explained that the Court had found Defendants in contempt of court, ordered Defendants to pay all of the costs imposed on Plaintiff as a result of their contemptuous activities, and set a hearing on Plaintiff's Motion for Preliminary Injunction. The Court subsequently reviewed the briefs filed with respect to Plaintiff's Motion for Preliminary Injunction and held a hearing on the matter on September 11, 2006, at the close of which, the Court ordered that the terms of the Modified TRO should remain in effect pending final resolution of Plaintiff's Motion by this Court. The Court now issues the present Memorandum Opinion and Order to resolve Plaintiff's Motion and to memorialize its reasoning in ordering that the terms of the Modified TRO should remain in effect.

II.   DISCUSSION

  A.   STANDARD FOR ISSUING A PRELIMINARY INJUNCTION

The Court's jurisdiction over the present lawsuit is based upon diversity of citizenship. In such diversity cases, federal courts apply the controlling state law, which in this case is North Carolina law. FMC Corp. v. Cyprus Foote Mineral Co., 899 F. Supp. 1477, 1480 (W.D.N.C. 1995) (citing Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994)). North Carolina state law specifically permits the issuance of preliminary injunctions in cases involving misappropriation of trade secrets. N.C. Gen. Stat. § 66-154(a) (2007) ("[A]ctual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action . . . .") However, when assessing requests for preliminary injunctions in a diversity case, federal courts are to apply federal standards. Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 811 (4th Cir. 1991).

Under these federal standards, the Court notes that a preliminary injunction is "an extraordinary remedy . . ., which is to be applied only in [the] limited circumstances which clearly demand it." Direx Israel, Ltd., 952 F.2d at 811 (second alteration in original) (internal quotations omitted). Nevertheless, the Court may grant a preliminary injunction after appropriate consideration of the following four factors: (1) the plaintiff's likelihood of success on the merits of the underlying dispute; (2) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (3) the likelihood of harm to the defendant if the injunction is issued; and (4) the public interest. Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75, 78–79

(4th Cir. 1989) (citing Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977)).

In weighing these factors, the Court notes that the most important among them are the potential harm to the plaintiff and the potential harm to the defendant. Hughes Network Sys. v. Interdigital Communications Corp., 17 F.3d 691, 693 (4th Cir. 1994). The required irreparable harm to the plaintiff "must be neither remote nor speculative, but actual and imminent." Direx, 952 F.2d at 812 (internal quotations omitted). If the plaintiff succeeds in making a "clear showing" that irreparable harm will result without injunctive relief, the Court must then balance the likelihood of that harm against the likelihood of harm to the defendant if the injunction is granted. Id. (internal quotations omitted). If the balance of the harms to each party "tips decidedly in favor of the plaintiff," a preliminary injunction will be granted if the plaintiff raises substantial questions as to the merits of the underlying case. Id. However, "[a]s the balance tips away from the plaintiff, a stronger showing on the merits is required." Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991). Thus, if "the balance of hardship 'does not tilt decidedly in plaintiff's favor' then a plaintiff must demonstrate a 'strong showing of likelihood of success' or a 'substantial likelihood of success' by 'clear and convincing evidence' in order to obtain relief." Microstrategy Inc. v. Motorola, Inc., 245 F.3d 335, 340 (4th Cir. 2001) (quoting Direx, 952 F.2d at 818 (internal quotation marks omitted) (citations omitted)). Hence, there is a correlation between the likelihood of the plaintiff's success on the merits and the probability of irreparable harm to the plaintiff. North Carolina State Ports Authority v. Dart

Containerline Co., 592 F.2d 749, 750 (4th Cir. 1979). "If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction." Id.

B. APPLICATION OF THE STANDARD TO THE PRESENT CASE

1. LIKELIHOOD OF SUCCESS ON THE MERITS

As the Court just explained, Plaintiff's burden to show irreparable harm in this case decreases as its likelihood of success on the merits grows. Accordingly, the Court in this case will, before balancing the relative harms to the parties, evaluate Plaintiff's chance of succeeding on the merits. Turning now to that issue, the Court first notes that Plaintiff may prove a likelihood of success on the merits of its misappropriation claim by establishing first that the information at issue is a "trade secret," and second, that it has made out a *prima facie* case that the defendant misappropriated that "trade secret." Merck & Co. v. Lyon, 941 F. Supp. 1443, 1456-57 (M.D.N.C. 1996); Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 594-97, 424 S.E.2d 226, 229-30 (1993). With regard the requirement that the information sought to be protected must be a "trade secret," the North Carolina Trade Secrets Protection Act is controlling:

> "Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and b. Is the subject of

> efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3) (2007). In addition to taking into account this statutory definition, North Carolina courts will also consider an additional six factors to assist in determining whether material constitutes a "trade secret:"

> (1) [T]he extent to which the information is known outside the business; (2) the extent it is known to those within the business; (3) the measures taken to guard its secrecy; (4) the value of the information to the business and its competitors; (5) the amount of time and money spent to develop the information; and (6) the ease or difficulty of properly acquiring or developing the information by others.

Eli Research, Inc. v. United Communs. Group LLC, 312 F. Supp. 2d 748, 756-57 (M.D.N.C. 2004).

Applying the statutory definition and factors laid out above to the present case, the Court first notes that the information Plaintiff seeks to protect in this case is its Library of information, which is comprised of "customers' detailed specifications [for sanding tool orders], the [Computer Aided Design ("CAD")] drawings and [Computer Numerical Control ("CNC")] programs [necessary] to make the [sanding tools], and the photographs necessary to sell and verify customers' orders." (Aff. of Manfred Brinkmann, Document #6, Ex. 2, p. 5.) The Court further notes that Plaintiff has spent over fifty years developing this Library, and has spent as much as $500,000 developing just a single product line. Id. at 5. This investment has allowed Plaintiff to develop tools that are unique to its industry because those tools' rubber base elements

7

and sanding caps may be easily replaced without removing the tool body from the sanding machine to which it is attached. This design gives Plaintiff a distinct advantage over its competitors. Id. at 3 ("[Plaintiff's] competitors' tool bodies must be removed from the multi-spindle or tool changer of the machine to replace the base elements, a distinct disadvantage.") Finally, the Court notes that Plaintiff's Library is available only to employees of Plaintiff or those under their supervision, and even then, only by those employees who hold a unique login and pass-code. Id. at 6. Based upon these facts, the Court finds that Plaintiff's Library is a "trade secret" within the meaning of N.C. Gen. Stat. § 66-152(3) to the extent that it is business or technical information that derives independent actual value from not being generally known, and is also the subject to reasonable efforts to maintain secrecy.

Defendants do not contest that Plaintiff's Library meets the definition of "trade secret" in this regard. Nevertheless, Defendants contend that Plaintiff's information does not constitute a "trade secret" because it is "readily ascertainable through independent development or reverse engineering." See N.C. Gen. Stat. § 66-152(3). In support of this contention, Defendants have offered the testimony of Mitchell Shore, a former employee of RJ Reynolds with experience in tool and machine design. In his testimony, Mr. Shore claimed to have reverse engineered production-quality duplicates of Plaintiff's rubber base elements and sanding caps in twenty-four hours using only rough customer approval drawings. However, after appropriately considering Mr. Shore's testimony at the hearing held on this matter on September 11, 2006, the Court excluded that testimony, concluding that Mr. Shore did not have the qualifications necessary to

8

assist the Court in determining whether Plaintiff's sanding tools could be reverse engineered. Thus, the Court finds that Defendants are left with no basis or support for their claim that the process by which Plaintiff produces its sanding tools is "readily ascertainable through independent development or reverse engineering."

Moreover, the evidence presented by Plaintiff belies Defendants' contention that Plaintiff's sanding tools are subject to reverse engineering. First, the Court notes that, to date, none of Plaintiff's competitors have proven able to independently develop or reverse engineer Plaintiff's unique tool design. (Aff. of Manfred Brinkmann, Document #6, Ex. 2, p. 3.) This observation by the Court is further borne out in an affidavit by Andrzej Holownia, a former employee of Defendants who was hired to manufacture duplicates of Plaintiff's sanding tools. In his affidavit, Mr. Holownia states that when he first began to make sanding caps for Defendants, Defendants received complaints from customers that the sanding caps did not match the profiles they had ordered. (Aff. of Andrej Holownia, Document #6, Ex. 3, p. 6.) However, Defendants thereafter gave Mr. Holownia two CD-ROMs full of CAD drawings that contained more complete information. Id. at 7-8. These computer files, Mr. Holownia, observed, were actually labeled with Plaintiff's name or contained references in the German language that appeared to come from Plaintiff; and once Holownia began to use them, he no longer had problems creating sanding tools that matched the profiles that customers ordered. Id. Therefore, the Court finds from this evidence that Defendants were unable to reproduce Plaintiff's sanding tools through their own independent development or reverse engineering, and were able to

9

satisfactorily duplicate such tools only after gaining access to detailed computer files that originated from Plaintiff.

Defendants next contend that even if some of the information Plaintiff seeks to protect constitutes a "trade secret," the entire contents of Plaintiff's Library may not be declared a "trade secret" because that Library includes various rough drawings and pieces of information which Plaintiff did not independently develop, but merely obtained directly from its customers. However, North Carolina courts have recognized that customer preferences may constitute trade secrets. Southtech Orthopedics v. Dingus, 428 F. Supp. 2d 410, 419 (E.D.N.C. 2006) (recognizing that special knowledge of customer needs and preferences ordinarily constitutes a "trade secret," especially where plaintiff and defendant are directly competing against each other). For example, in Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C., the North Carolina Court of Appeals affirmed the trial court's finding that knowledge of customer preferences on what type of equipment is needed for particular jobs is a trade secret. 174 N.C. App. 49, 54-56, 620 S.E.2d 222, 226-28 (2005). In particular, the court in Sunbelt noted that a "new market entrant has a significant advantage if it has access to [customer] information." Therefore, for this reason and the reasons stated above, the Court finds that the entire contents of Plaintiff's Library, including information Plaintiff obtained as a result of its customer relationships, constitutes a "trade secret" within the meaning of N.C. Gen. Stat. § 66-152(3).[2]

---

[2] Defendants also contend that the entirety of Plaintiff's Library is not a "trade secret" because, through their prior status as Plaintiff's distributor, they legitimately possess particular customer's drawings of profiles. However, information that is otherwise a "trade secret" retains

10

Having determined that Plaintiff's Library constitutes a "trade secret" under North Carolina law, the Court will next, in evaluating Plaintiff's likelihood of success on the merits of its misappropriation claim, determine whether Plaintiff has made out a *prima facie* case that Defendants misappropriated that Library. See Merck & Co., 941 F. Supp. at 1456-57; Barr-Mullin, Inc., 108 N.C. App. at 594-97, 424 S.E.2d at 229-30. Under North Carolina law, Plaintiff may establish its *prima facie* case if it can produce substantial evidence on the matter:

> Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both: (1) Knows or should have known of the trade secret; and (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

N.C. Gen. Stat. § 66-155 (2007).

Applying this standard to the case presently before the Court, the Court first notes that Defendants served as Plaintiff's marketing, sales, and distribution agents in the United States for eleven years. From this the Court finds that Defendants knew, or at least had reason to know, of the existence of Plaintiff's Library; and moreover, at no point in this litigation have Defendants asserted otherwise.

---

its status as such so long as it is guarded as secret and only discreetly disclosed within the business. See Sunbelt Rentals, Inc., 174 N.C. App. at 55, 620 S.E.2d at 227-28; see also Eli Research, Inc., 312 F. Supp. 2d at 756-57 (explaining that extent to which information is known outside the business is a factor in determining whether information is a "trade secret"). In this case, Plaintiff only disclosed limited customer information to Defendants for the circumscribed purpose of completing sales of their products. Thus, Defendants' limited possession of that information does not deprive it of "trade secret" status.

11

Next, with respect to whether Defendants acquired, disclosed, or used Plaintiff's Library without Plaintiff's consent, the Court observes that there is a great deal of evidence in the record indicating that Defendants did engage in such actions. In particular, the Court notes the testimony given by Sherrie Wasserman, Defendants' former chief financial officer, at a hearing held by the Court on August 22, 2006. Ms. Wasserman testified that Defendant Richuk, an owner and operator of the Defendant companies, made a statement that he would be willing to pay someone as much as $100,000 to obtain Plaintiff's "trade secrets" with respect to product designs. Additionally, Ms. Wasserman testified to mailing a computer at Richuk's request to the home address of a German employee of Plaintiff, specifically, Detlef Schroder ("Schroder"), at a time that the principals in Plaintiff's firm were out of town. Plaintiff asserts that Richuk mailed this computer to Schroder for the purpose of misappropriating Plaintiff's Library without Plaintiff's consent, and subsequent email exchanges between Richuk and Schroder support this assertion. Indeed, Richuk told Schroder in these emails to "[p]lease keep this strictly confidential between me and you," that "[w]e need to know the process from start to finish," and that "[w]e also need all the 3D drawings for all the ARMINIUS series of tool[s] . . . this way we can make a part for any head available from [Plaintiff]." (Supplement Re Mot. for Prelim. Inj., Document #46, Ex. A, pp. 5, 9, 14.) Moreover, one email Richuk sent to Schroder indicates that Richuk may have already been formulating an alibi to explain why Defendants were in possession of secret information from Plaintiff's Library. Id. at 27 ("We have been in possession of all the CAD files for customer approval drawings so the fact that we have CNC files could mean that

12

they were part of the drawing or sent with the drawings for customer approvals.")

In addition to this direct evidence of wrongdoing on the part of Richuk, the Court has also heard the testimony of Andrzej Holownia, who, as noted above, was hired by Defendants for the specific purpose of re-creating Plaintiff's tools. Mr. Holownia acknowledged that he was only successful in this endeavor after Defendants began giving him computer files of product designs that were written in German and labeled as coming from Plaintiff. Finally, the Court notes that Richuk has chosen to invoke his Fifth Amendment privilege against self-incrimination, and thus has not responded to any of the above facts which the Court has relied upon; nor has Richuk in any way denied the truth of Plaintiff's allegations that Richuk's interactions with Detlef Schroder involved a plot to misappropriate Plaintiff's Library. Based upon this invocation of the Fifth Amendment privilege, the Court will give greater credence to Plaintiff's evidence. Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558, 47 L. Ed. 2d 810 (1976) (recognizing rule that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.") (also recognized by the Fourth Circuit in In re Grand Jury Subpoena (Under Seal), 836 F.2d 1468, 1472 (4th Cir. 1988)).

Based upon the forgoing evidence, the Court finds that Plaintiff has established a *prima facie* case of misappropriation because there is substantial evidence in the record to show that Defendants knew or should have known of Plaintiff's Library, and that Defendants acquired and used that Library without Plaintiff's express or implied consent. See N.C. Gen. Stat. § 66-155.

Accordingly, the Court concludes that Plaintiff has demonstrated a high likelihood of success on the merits of its misappropriation claim.

### 2. BALANCING OF THE HARM TO BOTH PARTIES

Having determined that Plaintiff has demonstrated a high likelihood of success on the merits, the Court next turns to the task of balancing the harm to Plaintiff if the Court withholds a preliminary injunction with the harm to Defendants if the Court issues a preliminary injunction. In doing so, however, the Court notes that in cases where the likelihood of success on the merits is great, such as the one presently before the Court, a plaintiff's burden of proving a balance of irreparable harm that tips in its favor is correspondingly decreased. North Carolina State Ports Authority, 592 F.2d at 750.

With this lessened standard in mind, the Court first turns to the question of harm to Plaintiff, and observes that "irreparable harm [is presumed] where a trade secret has been misappropriated." Merck & Co., 941 F. Supp. at 1455 (granting manufacturer preliminary injunction in part because accurately calculating damages would be an insurmountable task). North Carolina courts also recognize that misappropriation of a trade secret is an injury of "such continuous and frequent recurrence that no reasonable redress can be had in a court of law." Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 597, 424 S.E.2d 226, 230 (1993) (granting preliminary injunction where defendant was able to modify software that plaintiff showed was not modifiable without access to plaintiff's secret "object code"). This is because "[t]he very nature of a trade secret mandates that misappropriation will have significant and continuous long-

14

term effects", such as permanent loss of competitive business advantage or market share. Id. Moreover, where, as in this case, "the principal relief sought is a permanent injunction, it is particularly necessary that the preliminary injunction issue . . . 'because . . . the refusal [of a preliminary injunction] . . . will virtually decide the case upon its merits and deprive the plaintiff of all remedy or relief, even though he should be afterwards able to show ever so good a case.' " A.E.P. Industries, Inc. v. McClure, 308 N.C. 393, 408-09, 302 S.E.2d 754, 763-64 (1983) (citing Cobb v. Clegg, 137 N.C. 153, 158-59, 49 S.E. 80, 82-83 (1904)). Finally, the Court recognizes that Defendants served as Plaintiff's primary marketing, sales, and distributing agents in the United States from 1993 until late 2004; and this further warrants issuing a preliminary injunction because, by virtue of their close association with Defendants, Plaintiff may very well lose goodwill within their industry, and potentially, future customers. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) (explaining that "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied" because monetary damages become difficult to calculate); see also Redlee/SCS, Inc. v. Pieper, 153 N.C. App. 421, 427, 571 S.E.2d 8, 14 (2002) (holding that evidence proving that defendant's acquisition of trade secrets would allow defendant to solicit plaintiff's customers was sufficient to show that plaintiff was likely to suffer irreparable loss unless injunction was issued). The prospect of permanent loss of customers by Plaintiff is especially pressing in this case given that the sanding tools Plaintiff sells require unique replacement parts, and thus, an initial sale creates

15

an ongoing business relationship. The fact that Defendants' misappropriation activities may deprive Plaintiff to some degree of these ongoing, profitable business relationships creates a harm to Plaintiff that cannot be easily quantified by this Court.[3] For these reasons, the Court finds that Plaintiff has made a showing that withholding a preliminary injunction in this case will impose on it a significant amount of irreparable harm.

In addition to evaluating Plaintiff's showing of irreparable harm, the Court must also take into account the harm that issuing a preliminary injunction would impose on Defendants. In doing so, the Court notes that, generally, the scope of a preliminary injunction must be narrowly tailored and should not deprive a defendant of the right to use its *own skills and talents* in the marketplace. See, e.g., FMC Corp., 899 F. Supp. at 1482 (finding against the plaintiff's request for injunctive relief "that effectively precludes [the defendant] from doing any work in his general area of expertise.") In this case, however, the Court has determined that there is substantial evidence that Defendants' business operations existing at the time of the preliminary injunction

---

[3] Defendants contend that loss of customers should not be a basis for finding irreparable harm to Plaintiff because any customers Plaintiff loses to Defendants are Defendants' customers to begin with by virtue of Defendants marketing and sales efforts. However, the Court has previously found that there is substantial evidence that Defendants misappropriated Plaintiff's Library, and the Court will not permit Defendants to benefit from this act by relying upon their ill-gotten ability to produce duplicates of Plaintiff's products. Defendants further contend that any customers Plaintiff loses will return to them should Plaintiff prevail in this lawsuit because Defendants and Plaintiff are the sanding industry's only source for Plaintiff's replacement parts. However, the Court has heard testimony from Ronald Frazier, a former employee of Defendants familiar with the sanding tool industry, that there are several competing companies in the industry who make tools similar to Plaintiff's. Indeed, the Court notes that customers may, as a result of this litigation, very well choose to buy all of their sanding tools from any one of those competitors instead of from Plaintiff.

hearing were greatly benefitted by the expertise Defendants obtained from Plaintiff's trade secrets. Therefore, the Court finds that even though the harm to Defendants in the Court's granting Plaintiff's request for a preliminary injunction shutting down Defendants' business operations is broad, this is the least acceptable remedy necessary to prevent Defendants from making use of information that was misappropriated from Plaintiff. As such, in weighing the balance of the harm to Plaintiff in withholding a preliminary injunction against the harm to Defendants if one is granted, the Court finds that the balance tips decidedly in favor of Plaintiff.

Finally, the Court also finds that a preliminary injunction is in the public interest because public policy favors a free market and disfavors allowing a competitor to drive another competitor out of business by unfairly misappropriating trade secrets. For all of these reasons, and after appropriately weighing the factors that the Court must consider in determining whether to issue a preliminary injunction, the Court finds that a preliminary injunction is in fact appropriate in the present case.

III. CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Preliminary Injunction [Document #9] will be GRANTED consistent with the terms of the Modified TRO [Document #42] in the manner set out below:

1. Defendants are hereby enjoined from misappropriating, obtaining, using, or benefitting from any information obtained after August 15, 2004 from any past or present employee of Plaintiff or from Plaintiff's computers, computer systems,

17

or computer network, or from whatever source obtained in connection with Plaintiff.

2. Defendants are hereby enjoined from displaying, offering, or selling any products which incorporate the misappropriated design of any Arminius tool or part.

3. Defendants are hereby enjoined from altering, deleting, disposing, despoiling, or destroying any files in their possession that contain information originated by Plaintiff or obtained from any past or present employee of Plaintiff or from Plaintiff's computers, computer systems, or computer network, or from whatever source obtained in connection with Plaintiff.

4. Defendants DII and Apex are to be officially closed until the final resolution of this case, without any operations continuing at their facilities.

5. Defendants Richuk and Leodolter are hereby ordered not to be present on the premises of DII or the Apex facility at any time during the pendency of the final resolution of this case, except as may be permitted or required by further order of this Court.

The Court further ORDERS that this Preliminary Injunction shall continue and remain in effect, and that the requirements of Rule 65(c) of the Federal Rules of Civil Procedure have been satisfied by Plaintiff's prior posting of $100,000 in security pursuant to this Court's previous TRO [Document #19].

18

Case 1:06-cv-00644-JAB-WWD   Document 112   Filed 02/15/07   Page 18 of 19

This, the 15th day of February, 2007.

                                                                 United States District Judge